**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | | |
|---|---|---|
| PAUL DONALD DAVIS and KATHY DAVIS, | * * * | Civil Action No.: |
| Plaintiffs, | * * | |
| vs. | * * | |
| OFFICER PAUL WALLER, OFFICER SHAUN BROWDER, OFFICER SCOTT WALDROUP, AND OFFICER ANDREW DRAKE, | * * * * * | **Jury Trial Demanded** |
| Defendants. | * * | |

## I.  NATURE OF ACTION

1.

This is an action under 42 U.S.C. § 1983 and Georgia law arising from unlawful seizure, excessive use of force, and deliberate indifference to constitutional rights by state and county law enforcement officers. The Defendants, law-enforcement officers with the Georgia State Patrol and the Oglethorpe County Sheriff's Office, pursued a violent felon named Ryan Arnold to a remote logging site where Plaintiff Don Davis and others were working, and then left Mr. Arnold alone with unarmed civilians while the officers, at a safe distance, set up a barricade of the logging site's dirt exit road. The county dispatcher then informed the officers by radio that Mr. Arnold had taken Don Davis hostage at gunpoint and was forcing him to drive out of the site in his logging truck. Despite this knowledge, the four named Defendants lay in wait at the barricade and then unloaded more than thirty rounds of ammunition through the driver's side of the truck cab, striking Don Davis six times and causing him severe and permanent physical and psychological injuries.

2.

Plaintiff Don Davis brings this action pursuant to 42 U.S.C. § 1983 for damages resulting from Defendants' unlawful and violent seizure of his person and their deprivation of his liberty without due process of law. As a further result of Defendants' deliberate actions, Plaintiff Kathy Davis suffered a loss of the consortium of her spouse that is compensable under Georgia law. Plaintiffs also seek the costs of this action, including reasonable attorneys' fees.

## II.  PARTIES, JURISDICTION, AND VENUE

3.

Plaintiffs Paul Donald Davis and Kathy Davis are adult citizens of the United States.

4.

Venue is proper under 28 U.S.C. § 1391 because at least one Defendant resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

5.

The Court has subject-matter jurisdiction of Plaintiff Don Davis's federal civil rights claims pursuant to 28 U.S.C. § 1331.

6.

The Court has supplemental jurisdiction of Plaintiff Kathy Davis's claim against all Defendants for loss of consortium pursuant to 28 U.S.C. § 1367.

7.

Defendant Officer Scott Waldroup is an Oglethorpe County Sheriff's Officer and is subject to the personal jurisdiction of this Court. He may be personally served with Summons and a copy of the complaint at Oglethorpe County Sheriff's Office ("OCSO") located at 115 Buddy Faust Road, Crawford, GA 30630.

8.

At all times relevant to this action, Defendant Waldroup was acting under color of state law and within the scope of his functions as a law enforcement officer in the OCSO.

9.

Defendant Officer Andrew Drake is an Oglethorpe County Sheriff's Officer and is subject to the personal jurisdiction of this Court. He may be personally served with Summons and a copy of the complaint at the OCSO located at 115 Buddy Faust Road, Crawford, GA 30630.

10.

At all times relevant to this action, Defendant Drake was acting under color of state law and within the scope of his functions as a law enforcement officer in the OCSO.

11.

Defendant Officer Paul Waller is a Georgia State Patrolman and is subject to the personal jurisdiction of this Court. He may be personally served with Summons and a copy of the complaint at the Georgia State Patrol ("GSP") Office located at 1050 Monticello Road, Madison, GA 30650.

12.

At all times relevant to this action, Defendant Waller was acting under color of state law and within the scope of his functions as a law enforcement officer employed by the GSP.

13.

Defendant Officer Shaun Browder is a Georgia State Patrolman and is subject to the person jurisdiction of this Court. He may be personally served with Summons and a copy of the complaint at the GSP Office located at 1050 Monticello Road, Madison, GA 30650.

14.

At all times relevant to this action, Defendant Browder was acting under color of state law and within the scope of his functions as a law enforcement officer employed by GSP.

15.

Although no ante litem notice is required for the claims asserted in this lawsuit, Plaintiffs timely served an ante litem notice upon Oglethorpe County on or about July 13, 2016.

16.

All claims in this action are timely asserted pursuant to 28 U.S.C. § 1988. The statute of limitations for all claims was tolled pursuant to O.C.G.A. § 9-3-99 until the criminal prosecution of Mr. Arnold was terminated by the entry of his guilty plea on or about January 5, 2017.

### III. RELEVANT FACTS

**A.      OCSO and GSP officers allowed a violent felon, Ryan Arnold, to escape from a house where he had shot his pregnant girlfriend.**

17.

On August 24, 2015, Oglethorpe County Emergency Dispatch received several phone calls from Cheryl Avery who voiced increasing concern for the safety and wellbeing of her pregnant friend, Haley Hill.

18.

Ms. Avery had received word that Ms. Hill's boyfriend, William Edgar Ryan Arnold, was physically assaulting Ms. Hill at their residence.

19.

Mr. Arnold, a convicted felon, was known to the police department as a public nuisance and had previously been party to several serious offenses such as armed robbery and drug possession.

20.

OCSO Sergeant Joe Tapley was dispatched to the residence of Mr. Arnold and Ms. Hill and arrived around 1:18 a.m.

21.

As the sergeant was attempting to make contact at the front door of the residence located at 51 Arnolds Place, a second officer, OCSO Deputy Steve Adkins, arrived as back-up.

22.

There are several homes located on the Arnold family property. 51 Arnolds Place is the home of Raymond Arnold, the father of Mr. Arnold. Mr. Arnold and Haley Hill were residing at this home during the events alleged herein.  21 Arnolds Place is the home of Elizabeth Michaelis, Ryan Arnold's Aunt.  During the events alleged herein, Mr. Arnold and Ms.  Hill travel between the various homes located on the Arnold family property.

23.

The sergeant continued knocking at the door until he heard a male subject ask, "Who is it?" Sergeant Tapley then heard a bump that was immediately followed by a single gunshot.

24.

Reacting to the gunshot, the sergeant pressed his back to the wall and attempted to contact dispatch to warn that shots were fired.  Deputy Adkins exited his vehicle and observed a white male located behind the residence with a rifle in his hand. Deputy Adkins called out to the subject to put down his weapon, and the individual froze, then quickly moved back toward the residence and disappeared.

25.

Coming from the front porch, Sergeant Tapley approached the corner of the residence and cleared the area.  Sergeant Tapley contacted Oglethorpe County Sheriff Mike Smith and said that he was unable to see anyone in or around the residence.

26.

Sheriff Mike Smith told responding officers to leave the scene and let the Criminal
Investigation Department handle the situation the next day.

27.

Without securing the scene, without investigating the use of a firearm on or around the
property of a known felon during a reported domestic-violence episode, and without inquiring as
to the safety of Ms. Hill, the responding officers left the scene. The Oglethorpe County District
Attorney's Office later told the press that "the failure by the deputies to clear the house after
hearing the gunshot was likely a contributing factor to [Ms. Hill's] death."

28.

The following morning, with family members expressing increased concerns about the
welfare of Haley Hill and the mental state of Mr. Arnold, OCSO Captain Waldroup,
accompanied by OCSO Corporal Scott Waldroup, returned to Mr. Arnold's residence.

29.

The Captain went to the front door of the residence as Corporal Waldroup went to the
side door.

30.

Again, officers knocked several times before they heard a male subject ask, "Who is it?"
Officers replied, "Sheriff's Office" to which the unknown male said he was going to get dressed.

31.

After several minutes had passed without the male returning to the door, Sheriff Mike Smith once again advised officers to leave the scene without confirming the condition or safety of Ms. Hill.

32.

Between noon and 1:00 p.m., Sheriff Mike Smith received information that the male in the house was Mr. Arnold and that he may have shot Ms. Hill.

33.

At this time, the Sheriff called GSP Special Weapons and Tactics (GSP SWAT) for assistance in the domestic-violence-turned-hostage situation at Arnolds Place.

34.

Sheriff Mike Smith was able to reach Mr. Arnold over the phone at least once. During this partially recorded phone call, Mr. Arnold was clearly not mentally stable and was highly emotional about the fact that he did not have custody of his son. Sheriff Smith requested that Mr. Arnold permit officers to examine Ms. Hill for injury, but Mr. Arnold refused to do so unless the officers exchanged Ms. Hill for Mr. Arnold's son. Mr. Arnold blamed Ms. Hill for his inability to see his son.

35.

The phone call ended when Sheriff Mike Smith told Mr. Arnold that he would contact

him again when his son arrived at the Sheriff's Department and would arrange for Mr. Arnold

and Ms. Hill to be picked up and brought to the Sheriff's Department.

36.

At approximately 2:30 p.m., Georgia State Patrol Trooper First Class ("TFC") Richard

Ceballos, who was acting in official capacity for GSP SWAT, arrived on scene with another

officer to surveil.  At this time, 21 Arnolds Place was the last known location of Mr. Arnold and

Ms. Hill.

37.

As TFC Ceballos made his way through the wooded area around Arnolds Place, he heard

someone shouting, "stand up, stand up!" He saw two figures stopped on Arnolds Place and heard

someone moaning and saying, "help!"

38.

Ceballos then saw a man traveling up Centerville Road alone but did not follow him for

several minutes. He eventually followed the man without checking on the location of the person

who had called for help.

39.

As he traveled through the woods on foot, Ceballos heard an officer say over the radio

that it looked like Mr. Arnold was getting into a vehicle. Ceballos stopped moving and heard a

truck approaching his location. He waited in the brush until the vehicle had passed.  He then

moved back towards 21 Arnolds Place, having let Mr. Arnold escape.

**B.    The Officers pursued the armed and wounded Ryan Arnold to the logging site where Plaintiff and others were working, then left him there, knowing that he was a threat to the lives and well-being of innocent people.**

40.

At approximately 3:30, Wilkes County Communications Center received a phone call

from Ms. Martha Sanders requesting an ambulance to 51 Arnolds Place for a woman named

Haley who was having trouble breathing.  Wilkes County Communications Center then

contacted the OCSO to report that they had received a call about a pregnant 22-year-old female

who was suffering from shortness of breath. OCSO confirmed that someone would be sent to 51

Arnolds Place.

41.

At approximately 3:53 p.m., Oglethorpe County Emergency Dispatch received a phone

call from Mr. Arnold's neighbor reporting that a male subject who matched the description of

Mr. Arnold had come through a field carrying a rifle; that Mr. Arnold had entered and exited a

house located across the street from him; and that Mr. Arnold had then gotten into a red Toyota

pick-up truck and begun to drive away.

42.

Moments later, two GSP Troopers caught up to Mr. Arnold and began pursuing him in

the red pickup truck. Shortly after making chase, however, one of the troopers noticed what

looked like a pile of clothing next to a wheelbarrow on the side of the road. The trooper stopped

only to discover that the pile of clothing was actually Ms. Hill, who was suffering from a gunshot wound.

43.

While these troopers were pursuing Mr. Arnold, Lieutenant Paul Waller, Trooper Shaun Browder and another GSP sergeant were monitoring traffic on a road adjacent to Mr. Arnold's residence.  These officers saw Mr. Arnold's red Toyota pickup truck turning around and began to pursue it.

44.

GSP Trooper Shaun Browder took lead and chased Mr. Arnold down a dirt road. Mr. Arnold lost control of his vehicle and spun out of control. When Mr. Arnold's truck came to a stop, he was face-to-face with Trooper Browder. Trooper Browder saw Mr. Arnold pointing a gun at him.

45.

Trooper Browder drew his weapon and exchanged fire with Mr. Arnold.  However, Trooper Browder's gun reportedly jammed, giving Mr. Arnold time to throw his truck into reverse and escape. A GSP corporal continued to chase Mr. Arnold but soon lost sight of him.

46.

Responding officers located Mr. Arnold's abandoned vehicle on a dirt exit road near a logging site. They knew, based on the timing, that he must be nearby.

47.

As law enforcement gathered on the road where Mr. Arnold was last seen, a phone call came to Wilkes County Communications Center. The caller was Anderson Standard, Sr. the foreman at a logging site off of the dirt road down which the officers had pursued Mr. Arnold.

48.

Mr. Standard, Sr. reported that a man who appeared to have been shot had approached Mr. Standard, Sr. and other men working at the site. This wounded man was Mr. Arnold.

49.

Mr. Standard, Sr. further reported that Mr. Arnold had drawn a gun and demanded that the men give him the keys to a service truck.

50.

Mr. Standard, Sr. informed the 911 operator that Mr. Arnold proceeded down a dead-end road in a service truck.

51.

Unable to find an exit at the rear of the property, Mr. Arnold drove the truck back to the logging area and demanded access to a large piece of logging equipment known as a skidder. Mr. Standard, Sr. was forced to end the phone call at that point; however, at approximately the same time, Anderson Standard Jr., another logger on the site, called Wilkes County Sheriff's Office Chief Deputy Donald Gene Turner's personal phone to update him on Mr. Arnold's location.

52.

After ending the call with Anderson Standard Jr., Chief Deputy Turner called Wilkes County Sheriff's Office Deputy Greg Rogers and another Deputy advising them to travel to the location of Mr. Arnold.

53.

At about this time, Justin Harris called Chief Deputy Turner to advise that Mr. Arnold was unable to find an exit at the rear of the property and had driven the stolen truck down a dead-end road. Chief Deputy Turner was also advised at this time that Mr. Arnold had stolen a .22 caliber rifle with a scope from a service truck.

54.

At this point, all of the Defendants knew that they had allowed the armed and desperate Mr. Arnold to escape from 21 Arnolds Place and had pursued him to the logging site, where he was threatening the loggers with a gun and trying to coerce them into helping him escape. Ignoring this threat to the loggers, Defendants set up a barricade on the exit road and waited in safety for Mr. Arnold to attempt to exit the logging site, leaving the loggers to navigate a life-threatening situation on their own.

55.

At approximately 4:31 p.m., Don Davis made a call to Oglethorpe County Emergency Dispatch to tell law enforcement that he had been taken hostage in his logging truck and that he was in fear for his life. "Ma'am… He's in my truck… He said he won't – that I won't survive if I don't… A fellow came up through the woods where we was loading at… I don't know his name

or nothing…" At that point, Mr. Davis dropped the phone on the floorboard of the logging truck and was unable to recover it because he was being forced to drive at gunpoint. At approximately 4:32 p.m., an Oglethorpe County Emergency Dispatch Operator told the law-enforcement officers on the scene: "I have a subject on the phone that is advising the subject y'all are looking for is in the vehicle with him advising that if he does not go where he's telling him to, he will kill him."

56.

Moments after this call, the officers, who were located at the exit-road barricade, observed a fully loaded logging truck slowly make a turn from the logging site onto the dirt exit road and push Mr. Arnold's abandoned red pickup truck out of the roadway. Defendants knew that this was the logging truck in which Mr. Arnold was forcing his hostage, Don Davis, to drive him out of the site.

57.

After Mr. Arnold's abandoned vehicle was out of the way, Mr. Arnold continued pointing his gun at Mr. Davis, forcing the hostage to continue traveling up the logging road in first gear toward an exit.

58.

Mr. Davis saw that law enforcement vehicles were blocking the exit road ahead and took his foot off the gas pedal. Mr. Arnold felt the truck slow down and began fighting with Mr. Davis over the gas pedal. Ultimately, Mr. Arnold reached down with his hand to depress the gas

pedal to keep the logging truck moving. In an effort to preserve his life, Mr. Davis continued steering the logging truck with no control over the pedals.

59.

At or approximately 4:36 p.m., officers heard a gunshot from the tractor-trailer. The truck, fully loaded and still in first gear, was traveling extremely slowly up the dirt road. According to statements made by WCSO Greg Rogers to investigators immediately following the incident, an officer on-scene at the time of the incident, the logging truck "was not going fast at all". OCSO Investigator Michael Mathews described the logging truck as "creeping" up the road in statements made to investigators immediately following the incident. The officers watched the truck for several minutes, until eventually it began to push the blockade of law enforcement vehicles out of its way.

60.

At this point, knowing that the driver of the truck was Mr. Arnold's hostage and was being forced at gunpoint to "go where [Arnold was] telling him to," Officer Paul Waller, Officer Shaun Browder, Officer Scott Waldroup and Officer Andrew Drake began firing their weapons with wild abandon at the driver's side of the tractor-trailer from very close range. More than 30 bullets riddled the windshield, the driver's side window, the driver's side door, and the rear side of the driver's cabin.

61.

The driver, Don Davis, was struck six times. His right hand was virtually blown off, and he was struck in the leg, shoulder, and buttocks.

62.

Under a barrage of gunfire, Don Davis realized that his life was more endangered by the police officers than by Mr. Arnold. Mr. Davis hit the truck's kill switch and jumped out of the vehicle, pleading with the officers not to shoot and collapsing on the ground.

63.

Mr. Davis was airlifted to Athens Regional Medical Center where he was treated for his injuries. Upon information and belief, Defendants later falsely reported that Mr. Arnold was the one driving the truck when they fired on it, even though the dispatcher had told them Davis was being forced to drive and they had seen Davis jump out of the driver's side of the truck cab.

64.

Mr. Davis was severely and permanently injured as a proximate result of the dangerous circumstances created by Defendants' foolish choices and wild and catastrophic use of force. Mr. Davis was an innocent victim who in no way contributed to causing the events that occurred on August 24, 2015. There was nothing Mr. Davis could do to avoid or mitigate the situation. Mr. Davis did nothing to contribute to his own injuries.

65.

The Georgia State Patrol Use of Deadly Force Policy (hereinafter, the "GSP Deadly Force Policy") defines "deadly force" as "force that has a reasonable probability of causing death."

66.

The GSP Deadly Force Policy then goes on to provide that "Members shall not discharge their firearms . . . [a]t a fleeing vehicle or the occupants, unless the occupants are using, or attempting to use, deadly force against a member or other person."  The GSP Deadly Force Policy also requires that "members shall consider the risks to innocent bystanders."

67.

The Oglethorpe County Sheriff's Office Use of Deadly Force Policy (hereinafter, the "OCSO Deadly Force Policy") provides as follows:

"Deadly force means that degree of force which is likely to cause death or great bodily harm."

68.

The OCSO Deadly Force Policy then provides that "A member is justified to use deadly force [only when] all other means of defense have failed or would be inappropriate under the circumstances . . .."

**COUNT I:  CLAIM AGAINST DEFENDANT WALDROUP UNDER 42 U.S.C. § 1983**

69.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 68, above.

70.

At the time that Mr. Arnold entered the logging site, Defendant Waldroup knew that Mr. Arnold was armed; that Mr. Arnold had already shot a pregnant woman and left her to die; that he had exchanged gunfire with police officers; and that he had abandoned his truck and was seeking means of escape.

71.

Defendant Waldroup knew that there were workers located at the logging site who were in danger because Defendants had pursued Mr. Arnold to their location. Defendant Waldroup made no effort whatsoever to extract Mr. Arnold from the logging site or to protect the workers at the site.

72.

Defendant Waldroup was not forced to make an immediate, hasty decision regarding the apprehension of Mr. Arnold, but had ample time to reflect and act while Mr. Arnold tried to steal several vehicles at the logging site, then hijacked the fully loaded log truck, and finally slowly rode up the dirt road with the uncooperative Mr. Davis driving his truck but refusing to shift out of first gear.

73.

Defendant Waldroup knew from the dispatcher's communication that Mr. Davis was being held against his will in the cab of the truck by Mr. Arnold and forced to drive where Mr. Arnold told him to go.

74.

Defendant Waldroup knew that Mr. Davis would not have been in this mortal danger if law enforcement had not let Mr. Arnold escape from 21 Arnolds Place, chased him to the logging site, and then left the loggers to deal with the situation unaided.

75.

Even as the logging truck was creeping towards the barricade, Defendant Waldroup had ample opportunity to take less violent measures to ensure the safety of himself, Mr. Davis, and the other law enforcement officers.

76.

Defendant Waldroup sat and waited as the truck approached the barricade, making no effort to disable the truck by non-lethal means such as spike strips, but intending to wait with his fellow officers until the truck came within range, and then open fire and attempt to kill the driver of the truck. Defendant Waldroup had full knowledge of this plan, participated willingly in it, and took no steps to stop his fellow officers from executing it. Defendant Waldroup knew that the truck's owner had been taken hostage and was most likely the person driving the truck.

77.

Defendant Waldroup knew that Mr. Davis was likely to be injured or killed if a hail of gunfire was directed at the driver's side of the truck cab.

78.

Despite this knowledge, and disregarding the obvious risk to Mr. Davis, Defendant Waldroup fired his weapon at the driver's side of the truck cab. The Defendants collectively struck the driver's side of the truck cab with more than thirty rounds of ammunition. Six of these rounds struck Mr. Davis.

79.

Defendant Waldroup's actions directly and proximately caused Mr. Davis significant pain and suffering, including but not limited to the emotional distress associated with being held hostage; the immediate pain associated with being shot; the fear of mortal peril; and the inability to continue his career due to health (physical and emotional) limitations stemming directly from the injuries sustained.

80.

Defendant Waldroup knew that the OCSO Deadly Force Policy restricted his use of deadly force to situations where all other means of defense had failed or would be inappropriate under the circumstances.  Other officers at the scene did not fire upon Mr. Davis because of the availability of these other means.

81.

Defendant Waldroup's actions constituted an unlawful and unreasonable forcible seizure of Mr. Davis, in violation of his rights under the Fourteenth Amendment of the United States Constitution.

82.

Defendant Waldroup's deliberate conduct shocks the conscience.

83.

As a result of Defendant Waldroup's unlawful actions and omissions, Waldroup is liable to Plaintiff Don Davis for personal injuries and violations of civil rights.

## COUNT II:  CLAIM AGAINST DEFENDANT DRAKE UNDER 42 U.S.C. § 1983

84.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 68, above.

85.

At the time that Mr. Arnold entered the logging site, Defendant Drake knew that Mr. Arnold was armed; that Mr. Arnold had already shot a pregnant woman and left her to die; that he had exchanged gunfire with police officers; and that he had abandoned his truck and was seeking means of escape.

86.

Defendant Drake knew that there were workers located at the logging site who were in danger because Defendants had pursued Mr. Arnold to their location. Defendant Drake made no effort whatsoever to extract Mr. Arnold from the logging site or to protect the workers at the site.

87.

Defendant Drake was not forced to make an immediate, hasty decision regarding the apprehension of Mr. Arnold, but had ample time to reflect and act while Mr. Arnold tried to steal several vehicles at the logging site, then hijacked the fully loaded log truck, and finally slowly rode up the dirt road with the uncooperative Mr. Davis driving his truck but refusing to shift out of first gear.

88.

Defendant Drake knew from the dispatcher's communication that Mr. Davis was being held against his will in the cab of the truck by Mr. Arnold.

89.

Defendant Drake knew that Mr. Davis would not have been in this mortal danger if law enforcement had not let Mr. Arnold escape from 21 Arnolds Place, chased him to the logging site, and then left the loggers to deal with the situation unaided.

90.

Even as the logging truck was creeping towards the barricade, Defendant Drake had ample opportunity to take less violent measures to ensure the safety of himself, Mr. Davis, and the other law enforcement officers.

91.

Defendant Drake sat and waited as the truck approached the barricade, making no effort to disable the truck by non-lethal means such as spike strips, but intending to wait with his fellow

officers until the truck came within range, and then open fire and attempt to kill the driver of the truck. Defendant Drake had full knowledge of this plan, participated willingly in it, and took no steps to stop his fellow officers from executing it. Defendant Drake knew that the truck's owner had been taken hostage and was most likely the person driving the truck.

92.

Defendant Drake knew that Mr. Davis was likely to be injured or killed if a hail of gunfire was directed at the driver's side of the truck cab.

93.

Despite this knowledge, and disregarding the obvious risk to Mr. Davis, Defendant Drake fired his weapon at the driver's side of the truck cab. The Defendants collectively struck the driver's side of the truck cab with more than thirty rounds of ammunition. Six of these rounds struck Mr. Davis.

94.

Defendant Drake's actions directly and proximately caused Mr. Davis significant pain and suffering, including but not limited to the emotional distress associated with being held hostage; the immediate pain associated with being shot; the fear of mortal peril; and the inability to continue his career due to health (physical and emotional) limitations stemming directly from the injuries sustained.

95.

Defendant Drake knew that the OCSO Deadly Force Policy restricted his use of deadly force to situations where all other means of defense had failed or would be inappropriate under

the circumstances.  Other officers at the scene did not fire upon Mr. Davis because of the availability of these other means.

96.

Defendant Drake's actions constituted an unlawful and unreasonable forcible seizure of Mr. Davis, in violation of his rights under the Fourteenth Amendment of the United States Constitution.

97.

Defendant Drake's deliberate conduct shocks the conscience.

98.

As a result of Defendant Drake's unlawful actions and omissions, Drake is liable to Plaintiff Don Davis for personal injuries and violations of civil rights.

## COUNT III: CLAIM AGAINST DEFENDANT BROWDER UNDER 42 U.S.C. § 1983

99.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 68, above.

100.

Defendant Browder pursued Mr. Arnold to the logging site, creating a danger to workers on the site that those workers would not otherwise have faced. The logging site workers had no

relationship with Mr. Arnold and were not in danger from him before Defendant Browder
pursued him to the site.

101.

At the time that Mr. Arnold entered the logging site, Defendant Browder knew that Mr.
Arnold was armed; that Mr. Arnold had already shot a pregnant woman and left her to die; that
he had exchanged gunfire with police officers; and that he had abandoned his truck and was
seeking means of escape.

102.

Defendant Browder knew that there were workers located at the logging site who were in
danger because Defendants had pursued Mr. Arnold to their location. Defendant Browder made
no effort whatsoever to extract Mr. Arnold from the logging site or to protect the workers at the
site.

103.

Defendant Browder was not forced to make an immediate, hasty decision regarding the
apprehension of Mr. Arnold, but had ample time to reflect and act while Mr. Arnold tried to steal
several vehicles at the logging site, then hijacked the fully loaded log truck, and finally slowly
rode up the dirt road with the uncooperative Mr. Davis driving his truck but refusing to shift out
of first gear.

104.

Defendant Browder knew from the dispatcher's communication that Mr. Davis was being held against his will in the cab of the truck by Mr. Arnold and forced to drive where Mr. Arnold told him to go.

105.

Defendant Browder knew that Mr. Davis would not have been in this mortal danger if law enforcement had not let Mr. Arnold escape from 21 Arnolds Place, chased him to the logging site, and then left the loggers to deal with the situation unaided.

106.

Even as the logging truck was creeping towards the barricade, Defendant Browder had ample opportunity to take less violent measures to ensure the safety of himself, Mr. Davis, and the other law enforcement officers.

107.

Defendant Browder had been instructed by his superior officers not to shoot, but simply to bring an end to the situation. Despite these instructions, Defendant Browder waited as the truck approached the barricade, making no effort to disable the truck by non-lethal means such as spike strips, but intending to wait with his fellow officers until the truck came within range, and then open fire and attempted to kill the driver of the truck. Defendant Browder had full knowledge of this plan, participated willingly in it, and took no steps to stop his fellow officers

from executing it. Defendant Browder knew that the truck's owner had been taken hostage and was most likely the person driving the truck.

108.

Defendant Browder knew that Mr. Davis was likely to be injured or killed if a hail of gunfire was directed at the driver's side of the truck cab.

109.

Despite this knowledge, and disregarding the obvious risk to Mr. Davis, Defendant Browder fired his weapon at the driver's side of the truck cab. The Defendants collectively struck the driver's side of the truck cab with more than thirty rounds of ammunition. Six of these rounds struck Mr. Davis.

110.

Defendant Browder's actions directly and proximately caused Mr. Davis significant pain and suffering, including but not limited to the emotional distress associated with being held hostage; the immediate pain associated with being shot; the fear of mortal peril; and the inability to continue his career due to health (physical and emotional) limitations stemming directly from the injuries sustained.

111.

Defendant Browder knew that the GSP Deadly Force Policy required him to consider the risks to innocent bystanders before discharging his weapons. Other officers at the scene did not fire because of the risks to Mr. Davis.

112.

Defendant Browder's actions constituted an unlawful and unreasonable forcible seizure of Mr. Davis, in violation of his rights under the Fourteenth Amendment of the United States Constitution.

113.

Defendant Browder's deliberate conduct shocks the conscience.

114.

As a result of Defendant Browder's unlawful actions and omissions, Browder is liable to Plaintiff Don Davis for personal injuries and violations of civil rights.

## COUNT IV: CLAIM AGAINST DEFENDANT WALLER UNDER 42 U.S.C. § 1983

115.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 68, above.

116.

At the time that Mr. Arnold entered the logging site, Defendant Waller knew or should have known that Mr. Arnold was armed; that Mr. Arnold had already shot a pregnant woman and left her to die; that he had exchanged gunfire with police officers; and that he had abandoned his truck and was seeking means of escape.

117.

Defendant Waller knew that there were workers at the logging site who were in danger because Defendants had pursued Mr. Arnold there. Despite this knowledge, Defendant Waller made no effort whatsoever to extract Mr. Arnold from the logging site or to protect the workers at the site.

118.

Defendant Waller was not forced to make an immediate, hasty decision regarding the apprehension of Mr. Arnold, but had ample time to reflect and act while Mr. Arnold tried to steal several vehicles at the logging site, then hijacked the fully loaded log truck, and finally slowly rode up the dirt road with the uncooperative Mr. Davis driving his truck but refusing to shift out of first gear.

119.

Defendant Waller knew from the dispatcher's communication that Mr. Davis was being held against his will in the cab of the truck by Mr. Arnold and forced to drive where Mr. Arnold told him to go.

120.

Defendant Waller knew that Mr. Davis would not have been in this mortal danger if law enforcement had not let Mr. Arnold escape from 21 Arnolds Place, chased him to the logging site, and then left the loggers to deal with the situation unaided.

121.

Even as the logging truck was creeping towards the barricade, Defendant Waller had ample opportunity to take less violent measures to ensure the safety of himself, Mr. Davis, and the other law enforcement officers.

122.

Defendant Waller had been instructed by his superior officers not to shoot, but simply to bring an end to the situation. Despite these instructions, Defendant Waller waited as the truck approached the barricade, making no effort to disable the truck by non-lethal means such as spike strips, but intending to wait with his fellow officers until the truck came within range, and then open fire and attempt to kill the driver of the truck. Defendant Waller had full knowledge of this plan, participated willingly in it, and took no steps to stop his fellow officers from executing it. Defendant Waller knew that the truck's owner had been taken hostage and was most likely the person driving the truck.

123.

Defendant Waller knew that Mr. Davis was likely to be injured or killed if a hail of gunfire was directed at the driver's side of the truck cab.

124.

Despite this knowledge, and disregarding the obvious risk to Mr. Davis, Defendant Waller fired his weapon at the driver's side of the truck cab. The Defendants collectively struck the driver's side of the truck cab with more than thirty rounds of ammunition. Six of these rounds struck Mr. Davis.

125.

As Mr. Davis exited the logging truck and was in Defendant Waller's clear line of vision, Waller fired one last round at him despite Mr. Davis being unarmed and begging law enforcement not to shoot.

126.

Defendant Waller's actions directly and proximately caused Mr. Davis significant pain and suffering, including but not limited to the emotional distress associated with being held hostage; the immediate pain associated with being shot; the fear of mortal peril; and the inability to continue his career due to health (physical and emotional) limitations stemming directly from the injuries sustained.

127.

Defendant Waller knew that the GSP Deadly Force Policy required him to consider the risks to innocent bystanders before discharging his weapons. Other officers at the scene did not fire because of the risks to Mr. Davis.

128.

Defendant Waller's actions constituted an unlawful and unreasonable forcible seizure of Mr. Davis, in violation of his rights under the Fourteenth Amendment of the United States Constitution.

129.

Defendant Waller's deliberate conduct shocks the conscience.

130.

As a result of Defendant Waller's unlawful actions and omissions, Waller is liable to Plaintiff Don Davis for personal injuries and for violations of civil rights.

## COUNT V: CLAIM AGAINST ALL DEFENDANTS FOR COSTS

131.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 130, above.

132.

Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to an award of the reasonable costs of this action, including but not limited to attorneys' fees.

## COUNT VI: CLAIM FOR LOSS OF CONSORTIUM UNDER GEORGIA LAW

133.

Plaintiff incorporates herein, as if re-stated verbatim, the allegations of paragraphs 1 through 130, above.

134.

Plaintiffs Don Davis and Kathy Davis have been married to each other at all relevant times.

135.

As a proximate result of Defendants' wrongful actions and omissions alleged above, and the resulting physical and psychological injuries suffered by Don Davis, Plaintiff Kathy Davis has suffered a loss of the consortium of her spouse, which is compensable under Georgia law.

136.

The Court has jurisdiction of this claim under 28 U.S.C. § 1367, because it is so closely related to Plaintiff Don Davis's federal-question claims as to form part of the same case or controversy.

WHEREFORE, Plaintiffs respectfully request the following relief:

    (a)    That Summons be issued;

    (b)    That the Summons and Complaint be served upon all defendants named herein;

    (c)    That the Court award Plaintiffs damages against all Defendants in an amount to be determined by the enlightened conscience of an impartial jury;

    (b)    That the Court grant Plaintiffs their reasonable costs and attorney's fees in bringing this action in an amount to be determined at trial;

    (d)    That Plaintiffs be granted a trial by jury on all issues so triable; and

    (e)    That Plaintiffs be granted such other and further relief as this Court deems just and proper.

This 9th day of October, 2018.

ANDERSEN, TATE & CARR, P.C.

    _/s/ Render C. Freeman_____
Render C. Freeman
Georgia State Bar No. 275910
Tyler A. Dillard
Georgia State Bar No. 115229
Jaletta L. Smith
Georgia State Bar No. 627518

1960 Satellite Blvd., Suite 4000
Duluth, Georgia 30097
770-822-0900
770-236-9759 (fax)
rfreeman@atclawfirm.com
tdillard@atclawfirm.com

Leighton Moore
The Moore Law Firm, P.C.
100 Peachtree Street NW
Suite 2600
Atlanta, GA 30303
678.237.0330
leighton@moorefirmpc.com

**ATTORNEYS FOR PLAINTIFFS**

3297351_1